Kim D. Stephens
kstephens@tousley.com
Jason T. Dennett
jdennett@tousley.com
Tousley Brain Stephens PLLC
1700 Seventh Avenue, Suite 2200
Seattle, WA 98101
Tel: (206) 682-5600
Fax: (206) 682-2992

*Interim Lead Plaintiffs' Counsel*

Keith S. Dubanevich
kdubanevich@stollberne.com
Yoona Park
ypark@stollberne.com
Stoll Berne
209 SW Oak Street, Suite 500
Portland, OR 97204
Tel: (503) 227-1600
Fax: (503) 227-6840

*Interim Liaison Plaintiffs' Counsel*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| IN RE: PREMERA BLUE CROSS CUSTOMER DATA SECURITY BREACH LITIGATION<br><br>_____<br><br>This Document Relates to All Actions. | Case No. 3:15-md-2633-SI<br><br>**DECLARATION OF ROBERT L. VIGIL, Ph.D. IN SUPPORT OF UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF PROPOSED SETTLEMENT AGREEMENT** |

**TABLE OF CONTENTS**

I.    INTRODUCTION ...................................................................................................1

    A.    Assignment ..................................................................................................1

    B.    Summary of Conclusions ............................................................................1

    C.    Qualifications ..............................................................................................2

    D.    Compensation ..............................................................................................2

    E.    Evidence Considered ...................................................................................3

II.   METHODOLOGY ...................................................................................................3

III.  VALUE OF INJUNCTIVE RELIEF ....................................................................10

IV.   VALUE OF ADDITIONAL DATA SECURITY PRACTICES ............................14

V.    CONCLUSION ......................................................................................................17

## I.      Introduction

### A.      Assignment

1.      I have been retained by Counsel for the Plaintiffs in the above-captioned matter to determine the value to the class members of the injunctive relief that Premera has agreed to pay for and implement over a three-year period ("Settlement Period") following the final approval of the Settlement Agreement ("Injunctive Relief").[1] I also have been asked to determine the value to the class members of the additional data security practices that Premera implemented from 2015 to 2018 in response to the present litigation.

2.      This declaration is based on the information available to date. Should additional information be provided subsequent to when this declaration is submitted, I will update my opinion, as necessary.

### B.      Summary of Conclusions

3.      Premera has committed to spend about $28.8 million on additional data security over the next three years, in addition to the more than $43.8 million it incurred in additional spending between 2015 and 2018. Based upon my review and analysis of the evidence received to date, I have concluded that the value to the class members of the Injunctive Relief that Premera has agreed to pay for and implement over the three-year Settlement Period is, at least, **$11,872,000.** The value to the class members of the additional data security practices that Premera implemented from 2015 to 2018 in response to the present litigation is, at least, **$30,104,000**. Combined, the benefits class members will receive and have received are worth at least **$41,976,000**. These valuations were estimated using the Cost Approach, which is a methodology commonly used by economists and finance professionals to value different types of assets, including intangible assets.

---

[1]      The terms of this Injunctive Relief are identified in Exhibit A to the Settlement Agreement.

**C.    Qualifications**

4.    I am a Principal at Analysis Group, Inc. ("Analysis Group"). Analysis Group provides economic and financial analysis for complex litigation, regulatory proceedings, and corporate strategic planning. Analysis Group maintains offices in Beijing, China; Boston, MA; Brussels, Belgium; Chicago, IL; Dallas, TX; Denver, CO; London, United Kingdom; Los Angeles, CA; Menlo Park, CA; Montreal, Canada; New York, NY; Paris, France; San Francisco, CA; and Washington, DC.

5.    Part of my work involves the application of economics and finance to general commercial litigation matters, including the assessment of damages, such as reasonable royalties, lost profits, price erosion, and unjust enrichment. In addition, I have substantial experience in product, business, and intangible asset valuations in a variety of non-litigation matters. I have taught classes, given presentations, and published articles on numerous damages and valuation related topics.

6.    I graduated from Pepperdine University in 1990 with a Bachelor of Arts degree in Economics. I also received a Ph.D. in Economics from the University of Maryland in 1998. In 2008, I was granted the Certified Licensing Professional ("CLP") designation by the Licensing Executives Society, which recognizes professionals who have demonstrated knowledge, experience, and proficiency in the licensing and commercialization of intellectual property.[2] My resume is attached as Exhibit 1. It describes all of my testimony, publications, and speeches, including those related to valuation and damages.

**D.    Compensation**

7.    My hourly billing rate for the time spent consulting and analyzing issues in this

---

[2]    http://www.licensingcertification.org/what-is-clp/ (viewed May 21, 2019).

case, which includes my study of pertinent issues and materials, and any testimony I might give, is $615. I also have directed the efforts of others at Analysis Group, whose hourly billing rates range from $330 to $455. My compensation is not dependent upon the outcome of this case or my findings.

### E.    Evidence Considered

8.    In undertaking my analysis, I have considered information from a variety of sources, each of which has been identified in Exhibit 2. I have also relied upon my professional judgment and expertise, gathered from many years of conducting economic analysis and valuing intangible assets.

## II.    Methodology

9.    The objective of my analysis is to determine the value to the class members of a) the Injunctive Relief that Premera has agreed to pay for and implement, and b) the additional data security practices that Premera implemented from 2015 to 2018 in response to the present litigation. While Premera also will receive value from the Injunctive Relief and from the additional data security practices enabled by its spending, this value is primarily indirect, *i.e.*, Premera's benefits are derived from the benefits obtained by members whose data is included in its database. Premera's demand for data security is a derived demand in that Premera benefits from better data security because its members and other Blue Cross Blue Shield Association ("BCBSA") members benefit.

10.    Premera's future spending related to the Injunctive Relief and its past spending on additional data security practices from 2015 to 2018 as a result of this litigation will lead to (in the case of future spending) and has led to (in the case of past spending) enhanced protection of the data in Premera's database. The data in Premera's database, which is considered an intangible asset

owned by the members,[3] increases in value as the security of the data is improved. As Dr. Bazelon noted, "[m]uch of the value of PII [("Personally Identifiable Information")] to Subjects is in their ability to exclude others, particularly criminals, from consuming that information…Violating the excludability of PII through its theft will therefore greatly diminish the value of the PII."[4] Because a second data breach would cause further harm to members by reducing the excludability of the PII, enhanced data protection increases the value of the data in Premera's database.

11.      As Premera spends money on enhanced data security and as the data in Premera's database increase in value, Premera's customers benefit. Because Premera's customers benefit, so too does Premera, which explains why it would be willing to spend money to obtain better data security for its customers. According to one source:

> Consumers value companies that prioritize safeguarding personal information—financials, health records, and social practices. One breach, a single mishandling of consumer data, or a lone vulnerability can be the tipping point for consumers to switch brands, products, and services. Some consumers have zero tolerance for a hack against a company. Even if the company fixes the problem, negative consumer sentiment may be so fully entrenched that perception is forever skewed. … Data from the survey shows cybersecurity can be influential in producing more brand loyalty. Consumers see value in companies providing more transparency and communication to assure cybersecurity protections are ongoing and present. When organizations invest and align cybersecurity as a business priority, they can

---

[3]   "According to accounting conceptual frameworks and standards developed in the United States (FASB 1985, 2010) and internationally (IASC 1998), data—the asset that by many accounts is at the heart of the business model of many companies (Spiekermann 2012)—meet all necessary criteria to be classified as an intangible asset." Sidgman, Juergen, and Malcolm Crompton, "Valuing Personal Data to Foster Privacy: A Thought Experiment and Opportunities for Research," *Journal of Information Systems,* vol. 30, no. 2 (2016): 169-181, at p. 171. *See also* Reilly, Robert F., and Robert P. Schweihs, *Valuing Intangible Assets,* McGraw Hill Professional, 1998, at pp. 5-7.
[4]   Declaration of Dr. Coleman Bazelon in Support of Plaintiffs' Motion for Class Certification, August 3, 2018, at ¶19.

> create advantageous positioning as trusted leaders and providers. Reputation and trust are precious attributes consumers seek, appreciate, and act on.[5]

This relationship between the benefits received by consumers and the benefits received by Premera is what connects Premera's spending on data security to the value obtained by its customers.

12.     To determine the increased value to the class members of this intangible asset (*i.e.*, the Injunctive Relief that Premera has agreed to pay for and implement over the three-year Settlement Period and the value to the class members of the additional data security practices that Premera implemented from 2015 to 2018 in response to the present litigation), I have utilized the Cost Approach.[6] The Cost Approach is a methodology commonly used by economists and finance professionals to value many different types of assets. According to Smith and Parr:

> The cost approach is especially useful for appraising highly specialized property, such as a foundry, a reservoir, a steel mill, coal unloading facilities, a nuclear reactor, telephone switching centers, power plants, electric substations, or a satellite earth station. The cost approach is also very useful as a valuation method for certain intangible assets, such as computer software, an assembled workforce, corporate practices, quality control procedures, engineering drawings, assembly practices, purchasing procedures, packaging designs, and distribution networks. It is often used when other valuation methods are not applicable or to allocate values among assets that may have been valued in total by another means.[7]

13.     Researchers have noted that the Cost Approach is particularly well-suited to valuing

---

[5]    https://www.theatlantic.com/sponsored/kpmg-2016/undervalued-the-business-benefits-of-cybersecurity/1034/ (viewed May 28, 2019).

[6]    In addition to the Cost Approach, two other methods used to value intangible assets are the Market Approach and the Income Approach. Reilly, Robert F., and Robert P. Schweihs, *Valuing Intangible Assets,* McGraw Hill Professional, 1998, at p. 96. Due to data availability, the Cost Approach was utilized in this case.

[7]    Smith, Gordon V., and Russell L. Parr, *Valuation of Intellectual Property and Intangible Assets*, Third Edition, New York: Wiley, 2000, at p. 208.

intangible assets, the type of asset that I am valuing in this case. For example, Reilly and Schweihs observed:

> Cost approach methods are an appropriate component of many types of economic analyses related to intangible assets. Of course, cost approach methods are an integral part of intangible asset valuation.[8]

> [T]he cost approach is one of the three fundamental approaches to intangible asset valuation.[9]

14.    As Reilly and Schweihs noted, this approach is most applicable in situations, similar to this case, where cost information is known, the intangible asset being valued is new (*i.e.*, the improvement in data security), and the type of value being estimated is the value in continued use by the current owner:

> The cost approach methods are most applicable (and most practical) when detailed data are available with regard to the costs to create the intangible assets that are subject to appraisal. Generally, cost approach methods may be more applicable when the subject intangible is newer and when it is a fungible property. More weight is given to the cost approach methods when the analyst is estimating the value of the intangible to its current owner. These methods may also be more applicable when estimating the value of an intangible under the premise of value in continued use.[10]

---

[8]    Reilly, Robert F., and Robert P. Schweihs, *Valuing Intangible Assets,* McGraw Hill Professional, 1998, at p. 119.

[9]    Reilly, Robert F., and Robert P. Schweihs, *Valuing Intangible Assets,* McGraw Hill Professional, 1998, at p. 127. *See also* Hunter, Laurie, Elizabeth Webster, and Anne Wyatt, "Measuring Intangible Capital: A Review of Current Practice," *Australian Accounting Review*, vol. 15, no. 2 (2005): 4-21, at p. 4 (The main conclusion of the paper is to suggest that "the way to a standardised, more comparable approach to measuring intangible capital is to employ a back to basics 'costs' approach …").

[10]    Reilly, Robert F., and Robert P. Schweihs, *Valuing Intangible Assets,* McGraw Hill Professional, 1998, at p. 254. *See also* Pratt, Shannon P., and Alina V. Niculita, *Valuing a Business: The Analysis and Appraisal of Closely Held Companies,* McGraw-Hill Companies, 2008, at pp. 369-371.

15.    The Cost Approach is also used and accepted in a variety of litigation contexts involving intangible assets. According to Reilly and Schweihs:

> Cost approach methods may also be applicable when estimating the amount of damages suffered by the intangible asset owner in an infringement, expropriation, breach of contract, or similar type of litigation. In these cases, the analyst may estimate the amount of damages as the amount of benefits gained by the defendant associated with the unlawful act; for example, the cost of creating the intangible asset that the defendants avoided due to their actions. Or, the analyst could estimate the cost-based value of the intangible asset to the owner, that is, the value before the defendants' actions. Since the intangible has been somehow damaged, its current value is less than its (pre-damage) cost-based value. Accordingly, the difference between these two value indications is one measure of economic damages.[11]

16.    Courts have found the Cost Approach to be an acceptable valuation methodology in a wide variety of cases. For example, Courts have accepted the use of the Cost Approach to value, among other things:

- a medical center's facilities (land, land improvements, building, and equipment);[12]

- process and handling fees paid to physicians;[13]

- a building and its underlying land value;[14]

- patents directed to the positioning and placement of components in side-by-side off-road vehicles;[15]

- trade secrets related to mechanical couplers for earthmoving equipment;[16]

---

[11]    Reilly, Robert F., and Robert P. Schweihs, *Valuing Intangible Assets,* McGraw Hill Professional, 1998, at p. 119.
[12]    *Via Christi Reg'l Med. Ctr., Inc. v. Burwell*, 78 F. Supp. 3d 416, 428-430 (D.D.C. 2015).
[13]    *United States ex rel. Lutz v. Berkeley Heartlab, Inc.*, 2017 U.S. Dist. LEXIS 135678, at *5, 12 (D.S.C. 2017).
[14]    *Steffy v. Home Depot, Inc.*, 2008 U.S. Dist. LEXIS 99624, at *17, 25-26 (M.D. Pa. 2008).
[15]    *Polaris Indus. v. Artic Cat, Inc.*, 2019 U.S. Dist. LEXIS 61340, at *1-5, 19 (D. Minn. 2019).
[16]    *Miller UK Ltd. v. Caterpillar, Inc.*, 2015 U.S. Dist. LEXIS 147843, at *2, 46, 50, 56 (N.D.

- a patent related to the migration of subscriber lines from old line frame equipment to new equipment;[17]

- a lease between private companies;[18]

- patents directed to a system of transmitting high frequency data signals and lower frequency voice band signals over conventional telephone wiring;[19]

- emergency medical services and medical transportation services business;[20]

- a patent related to a device that uses a light source to project light onto an object to be cut by a rotary saw to align the cut of the saw;[21]

- large herds of specialty cattle;[22] and

- patents related to various smartphone features.[23]

17.     The premise of the Cost Approach is that "the cost to purchase or develop [an asset] is commensurate with the economic value of the service that the [asset] can provide during its life."[24] Basic economics suggests that a party would only spend money to develop or acquire an asset if the expected value to be derived from that asset exceeded the costs to develop or acquire it. If the costs (or prices) required to obtain the asset exceeded the present value of the future

---

Ill. 2015).

[17]   *Metaswitch Networks, Ltd. v. Genband US LLC*, 2016 U.S. Dist. LEXIS 28236, at *8-9, 11 (E.D. Tex. 2016).

[18]   *Lock Realty Corp. IX v. U.S. Health, LP*, 707 F.3d 764, 771 (7th Cir. 2013).

[19]   *Inline Connection Corp. v. AOL Time Warner, Inc.*, 470 F. Supp. 2d 424, 428 n.11, 434-435 (D. Del. 2007); *Inline Connection Corp. v. AOL Time Warner, Inc.*, 302 F. Supp. 2d 307, 310 (D. Del. 2004).

[20]   *Icare-Ems, Inc. v. Rural Metro Corp.*, 2012 U.S. Dist. LEXIS 85336, at *2, 7-9 (E.D. Tenn. 2012).

[21]   *Caluori v. One World Techs., Inc.*, 2012 U.S. Dist. LEXIS 25508, at *2, 5-6, 18-19 (C.D. Cal. 2012).

[22]   *Bear Ranch, LLC v. HeartBrand Beef, Inc.*, 2014 U.S. Dist. LEXIS 35312, at *35-37 (S.D. Tex. 2014).

[23]   *Apple, Inc. v. Samsung Elecs. Co., Ltd.*, 2014 U.S. Dist. LEXIS 24506, at *17-18, 28-29, 53 (N.D. Cal. 2014).

[24]   Smith, Gordon V., and Russell L. Parr, *Valuation of Intellectual Property and Intangible Assets*, Third Edition, New York: Wiley, 2000, at pp. 197-198.

economic benefits of the asset, no one would pay those costs (or those prices) to acquire it.[25] In this case, the asset being obtained as a result of Premera's spending is a greater level of data security that will accrue to the class members.

18.     Inherent in Premera's decision to spend money on data security is a belief that its customers will benefit by an amount *at least as much as* it spends. Premera may believe that its customers will benefit by more than what it spends, but not less. If Premera did not believe its customers would benefit by the amount it has already spent and has agreed to spend, it would not be rational for Premera to spend this money. Because Premera's alternatives to spending this money on data security include reducing its premiums to consumers by this same amount, Premera must believe its customers would receive at least as much, or more, value from the money being spent on enhanced data security as getting this money back in the form of reduced prices.

19.     For example, Premera had the choice of spending the additional $28.8 million it has committed to spending on data security over the Settlement Period or of giving this money back to consumers in the form of lower prices. We know that Premera's customers would value this $28.8 million price reduction at $28.8 million. Because Premera instead chose to spend this money on better data security pursuant to the Settlement Agreement, Premera (and the class) must believe that Premera's customers would get the same or greater value from this money being spent on enhanced data security. For this reason, Premera's historical and promised cost expenditures represent the minimum value that individuals whose personal information is in Premera's database have received or are expected to receive from this spending.[26]

──────────────────────────────

[25]  Smith, Gordon V., and Russell L. Parr, *Valuation of Intellectual Property and Intangible Assets*, Third Edition, New York: Wiley, 2000, at p. 198.

[26]  As noted above, Premera's benefits from data security are derived from the benefits obtained by members whose data is included in its database. Accordingly, the relationship between the

### III.   Value of Injunctive Relief

20.     To determine the value to the class members of the Injunctive Relief agreed to by Premera and the class members, I first estimated the *incremental* cost that Premera agreed to pay as part of the injunction following the final approval of the Settlement Agreement. While an argument could be made that all of the IT security costs that Premera agreed to pay as part of the injunction, as identified in Exhibit A to the Settlement Agreement, are incremental, I have conservatively calculated Premera's incremental costs as the difference between a) the IT security costs Premera agreed to pay, pursuant to Exhibit A of the Settlement Agreement, and b) the IT security costs that Premera would have spent, absent the injunction.

21.     According to the injunction, for a period of three years from the date of final approval of the Settlement Agreement, Premera agreed to spend at least $14,000,000 *per year* on core cybersecurity operations, investments, and initiatives whose primary purpose is to improve or maintain information protection.[27] To estimate the IT security costs that Premera would have spent over this same three-year period, absent the injunction, I relied upon Premera's historical IT security cost spending from 2012 to 2014, which averaged $4,401,333 *per year* over this period.[28] I utilized Premera's historical spending from 2012 to 2014, as opposed to 2015-2018, in order to account for the fact that Premera's spending from 2015 to the present has been significantly higher as a result of this litigation.[29]

---

preferences of Premera and that of its customers is what enables one to use Premera's costs to value the benefits that have been received by or are expected to be received by individuals whose personal information is in Premera's database.

[27]   Exhibit A to the Settlement Agreement.

[28]   According to Premera, in 2012, 2013, and 2014, it spent $4,004,000, $4,448,000, and $4,752,000, respectively, on IT security.

[29]   According to Premera, it spent $16,000,000 on IT security in 2015 and 2016, $15,000,000 in 2017, and $14,500,000 in 2018.

22.    As Table 1, below, shows, over the three-year Settlement Period, Premera has agreed to spend a total of $42,000,000 to maintain information protection. Absent the injunction, over this same period, Premera would have spent a total of $13,203,999. This suggests that Premera will spend an additional $28,796,001 to maintain information protection as a result of the injunction.

**Table 1**
**Incremental Spending Due to Injunction**
**Settlement Period**

|  | Year 1 | Year 2 | Year 3 | Total |
|---|---|---|---|---|
| Premera Injunction Budget | $14,000,000 | $14,000,000 | $14,000,000 | $42,000,000 |
| But-for Premera IT Security Costs | $4,401,333 | $4,401,333 | $4,401,333 | $13,203,999 |
| Incremental Spending | $9,598,667 | $9,598,667 | $9,598,667 | $28,796,001 |

23.    Because the information protection enabled by Premera's incremental spending is substantially non-rivalrous, which means that consumption of these benefits by one customer does not decrease the availability or consumption of the benefits by other customers,[30] an argument can be made that all of the $28,796,001 in incremental spending by Premera will directly benefit the class members and can, as a result, be treated as value obtained by the class members. This notwithstanding, in determining the value obtained by the class members, I have conservatively apportioned the $28,796,001 in incremental spending to account for the fact that this spending will benefit not only the class members, but other non-class Premera customers as well.

24.    To determine how much of this spending can be counted as value to the class members, as opposed to other non-class Premera customers that also will benefit from the

---

[30]    In economics, a good or service is considered rivalrous if one person's use of the good or service reduces another person's use. *See, e.g.*, Mankiw, N. Gregory, *Principles of Economics*, Sixth Edition, South-Western Cengage Learning, 2008, at p. 218.

incremental spending, conservatively assuming that the benefits from the incremental spending are rivalrous, I identified the following five groups of customers that will benefit from Premera's incremental spending over the Settlement Period: 1) the class members, 2) Premera plan members whose data was added to Premera's database from 2015 to 2019, 3) other BCBSA plan members whose data was added from 2015 to 2019, 4) Premera plan members that will be added over the three-year Settlement Period, and 5) other BCBSA plan members that will be added over the three-year Settlement Period.

25.     I understand that there are 10,600,000 class members. According to Premera, it added data from 7,921,685[31] Premera plan members from 2015 to 2019 and data from 2,831,453[32] other BCBSA plan members from 2015 to 2019. Assuming that Premera adds the same number of Premera plan members in each year of the three-year Settlement Period as it did in 2019, I have projected that in the first year of the Settlement Period, there will be an additional 1,584,115 Premera plan members, in the second year there will be an additional 3,168,230 Premera plan members, and in the third year there will be an additional 4,752,345 Premera plan members. Assuming that Premera adds the same number of other BCBSA plan members in each year of the three-year Settlement Period as it did in 2019, I have projected that in the first year of the Settlement Period, there will be an additional 628,196 other BCBSA plan members, in the second year there will be an additional 1,256,392 other BCBSA plan members, and in the third year there will be an additional 1,884,588 other BCBA plan members. I have summarized this information in Table 2 below.

_____

[31]   According to Premera, in 2015, 2016, 2017, 2018, and 2019, it added 1,673,642, 1,607,889, 1,489,630, 1,566,409, and 1,584,115 Premera plan members, respectively.

[32]   According to Premera, in 2015, 2016, 2017, 2018, and 2019, it added 448,572, 565,378, 573,681, 615,626, and 628,196 other BCBSA plan members, respectively.

**Table 2**
**Number of Consumers That Will Benefit From Incremental Spending**
**Settlement Period**

|  | Year 1 | Year 2 | Year 3 |
|---|---|---|---|
| Class Members | 10,600,000 | 10,600,000 | 10,600,000 |
| Premera Plan Members Added (2015-2019) | 7,921,685 | 7,921,685 | 7,921,685 |
| Other BCBSA Plan Members Added (2015-2019) | 2,831,453 | 2,831,453 | 2,831,453 |
| Premera Plan Members To Be Added (Over 3 Years) | 1,584,115 | 3,168,230 | 4,752,345 |
| Other BCBSA Plan Members To Be Added (Over 3 Years) | 628,196 | 1,256,392 | 1,884,588 |
| Total | 23,565,449 | 25,777,760 | 27,990,071 |

26.     As Table 3 shows, dividing the incremental spending by Premera in each year over the Settlement Period by the number of Premera customers that will benefit from this spending suggests that each customer will benefit by between $0.34 and $0.41 per year (*i.e.*, the value of Premera's spending by each customer in each year over the Settlement Period is, on average, between $0.34 and $0.41).

**Table 3**
**Value of Incremental Spending Per Customer**
**Settlement Period**

|  | Year 1 | Year 2 | Year 3 |
|---|---|---|---|
| Incremental Spending | $9,598,667 | $9,598,667 | $9,598,667 |
| Number of Customers That Will Benefit | 23,565,449 | 25,777,760 | 27,990,071 |
| Value Per Customer | $0.41 | $0.37 | $0.34 |

27.     As Table 4 shows, multiplying these values per customer by the 10,600,000 class members suggests that the total value of Premera's incremental spending required under the Settlement Agreement to the class members is at least **$11,872,000**. As noted above, this calculation is conservative because it assumes that the benefits enabled by Premera's incremental spending are entirely rivalrous, which is not the case. It also is conservative because, as noted above, Premera's promised cost expenditures represent the *minimum* value that individuals whose

personal information is in Premera's database are expected to receive from this spending.

**Table 4**
**Value To Class Members of Incremental Spending**
**Settlement Period**

|  | Year 1 | Year 2 | Year 3 | Total |
|---|---|---|---|---|
| Value Per Customer | $0.41 | $0.37 | $0.34 | $1.12 |
| Number of Class Members | 10,600,000 | 10,600,000 | 10,600,000 | 10,600,000 |
| Value to Class Members | $4,346,000 | $3,922,000 | $3,604,000 | $11,872,000 |

## IV.     Value of Additional Data Security Practices

28.     Using a similar methodology, I have determined the value to the class members of the additional data security practices that Premera implemented from 2015 to 2018 in response to the present litigation. To do so, I first estimated the *incremental* spending by Premera over this period that appears to be related to the present litigation. I calculated Premera's incremental costs as the difference between a) Premera's actual IT security costs from 2015-2018, and b) the IT security costs that Premera would have spent over this period, absent the litigation by the class.

29.     As Table 5 shows, from 2015 to 2018, Premera spent between $14,500,000 and $16,000,000 per year on IT security. To estimate the IT security costs that Premera would have spent over this period, absent the litigation, I relied upon Premera's historical IT security cost spending from 2012 to 2014, which averaged $4,401,333 *per year* over this period.[33] This suggests that from 2015 to 2018, as a result of the present litigation, Premera likely spent an additional $10,098,667 to $11,598,667 per year on IT security over this period ($43,894,668 in total).

---

[33]   According to Premera, in 2012, 2013, and 2014, it spent $4,004,000, $4,448,000, and $4,752,000, respectively, on IT security.

**Table 5**
**Incremental Spending Due to Litigation**
**2015-2018**

|                                  | 2015        | 2016        | 2017        | 2018        |
|----------------------------------|-------------|-------------|-------------|-------------|
| Actual Premera Spending          | $16,000,000 | $16,000,000 | $15,000,000 | $14,500,000 |
| But-for Premera IT Security Costs| $4,401,333  | $4,401,333  | $4,401,333  | $4,401,333  |
| Incremental Spending             | $11,598,667 | $11,598,667 | $10,598,667 | $10,098,667 |

30.    As noted above, because the IT security enabled by Premera's incremental spending is substantially non-rivalrous, an argument can be made that all of the incremental spending by Premera will directly benefit the class members and can, as a result, be treated as value obtained by the class members. This notwithstanding, in determining the value obtained by the class members, I have conservatively apportioned the incremental spending to account for the fact that this spending benefited not only the class members, but other non-class Premera customers as well.

31.    To determine how much of this spending can be counted as value to the class members, as opposed to other non-class Premera customers that also benefited from the incremental spending, conservatively assuming that the benefits from the incremental spending are rivalrous, I identified the following three groups of customers that benefited from Premera's incremental spending that occurred from 2015 to 2018: 1) the class members, 2) Premera plan members that were added from 2015 to 2018, and 3) other BCBSA plan members that were added from 2015 to 2018.

32.    As discussed above, there are 10,600,000 class members. According to Premera, in 2015, 2016, 2017, and 2018, it added 1,673,642, 1,607,889, 1,489,630, and 1,566,409 Premera plan members, respectively. In 2015, 2016, 2017, and 2018, Premera added 448,572, 565,378, 573,681, and 615,626 other BCBSA plan members, respectively. Using this information, in Table

15

6, I have determined how many consumers benefited in each year from Premera's incremental spending on IT security from 2015 to 2018.[34]

**Table 6**
**Number of Consumers That Benefited From Incremental Spending**
**2015-2018**

|  | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|
| Class Members | 10,600,000 | 10,600,000 | 10,600,000 | 10,600,000 |
| Premera Plan Members Added (2015-2018) | 1,673,642 | 3,281,531 | 4,771,161 | 6,337,570 |
| Other BCBSA Plan Members Added (2015-2018) | 448,572 | 1,013,950 | 1,587,631 | 2,203,257 |
| Total | 12,722,214 | 14,895,481 | 16,958,792 | 19,140,827 |

33.    As Table 7 shows, dividing the incremental spending by Premera in each year from 2015 to 2018 by the number of Premera customers that benefited from this spending in each year suggests that each customer benefited by between $0.53 and $0.91 per year (*i.e.*, the value of Premera's spending by each customer in each year from 2015 to 2018 is, on average, between $0.53 and $0.91).

**Table 7**
**Value of Incremental Spending Per Customer**
**2015-2018**

|  | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|
| Incremental Spending | $11,598,667 | $11,598,667 | $10,598,667 | $10,098,667 |
| Number of Customers That Benefited | 12,722,214 | 14,895,481 | 16,958,792 | 19,140,827 |
| Value Per Customer | $0.91 | $0.78 | $0.62 | $0.53 |

34.    As Table 8 shows, multiplying these values per customer by the 10,600,000 class members suggests that the total value of Premera's incremental spending due to the present

---

[34] The number of Premera Plan Members Added (2015-2018) and Other BCBSA Members Added (2015-2018) that benefited from Premera's incremental spending in a given year equals the number of members that were added in that year and prior years starting in 2015.

litigation to the class members is at least **$30,104,000**. As noted above, this calculation is conservative because it assumes that the benefits enabled by Premera's incremental spending are entirely rivalrous, which is not the case. It also is conservative because, as noted above, Premera's historical cost expenditures represent the *minimum* value that individuals whose personal information is in Premera's database have received from this spending.

**Table 8**
**Value To Class Members of Incremental Spending**
**2015-2018**

|  | 2015 | 2016 | 2017 | 2018 | Total |
|---|---|---|---|---|---|
| Value Per Customer | $0.91 | $0.78 | $0.62 | $0.53 | $2.84 |
| Number of Class Members | 10,600,000 | 10,600,000 | 10,600,000 | 10,600,000 | 10,600,000 |
| Value to Class Members | $9,646,000 | $8,268,000 | $6,572,000 | $5,618,000 | $30,104,000 |

## V.    Conclusion

35.    This declaration is based on the information available to date. Should additional information be provided subsequent to when this declaration is submitted, I will update my opinion, as necessary.

I declare under penalty of perjury of the laws of the District of Columbia and the United States that the foregoing is true and correct.

DATED this 29th day of May, 2019, at Washington, D.C.

_____

Robert L. Vigil, Ph.D.